IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

GARY D. BRADY,

            Plaintiff,

        v.                                    Civil Action No. 2:07-CV-17

MICHAEL J. ASTRUE,
Commissioner of Social Security,

            Defendant.


**REPORT AND RECOMMENDATION
SOCIAL SECURITY**

**I.  Introduction**

A.      Background

        Plaintiff, Gary Brady, (Claimant), filed his Complaint on February 23, 2007, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on

November 14, 2007.[2]  Claimant filed his Motion for Summary Judgment on December 14, 2007.[3]

Commissioner filed his Motion for Summary Judgment on March 14, 2008.[4]  Claimant filed his

Response to Commissioner's Motion on April 2, 2008.[5]

---

[1] Docket No. 1.

[2] Docket No. 13.

[3] Docket No. 19.

[4] Docket No. 24.

[5] Docket No. 25

B. The Pleadings

    1. Plaintiff's Brief in Support of Motion for Summary Judgment.

    2. Defendant's Brief in Support of His Motion for Summary Judgment.

    3. Plaintiff's Response to Defendant's Motion for Summary Judgment.

C. Recommendation

I recommend that:

    1. Claimant's Motion for Summary Judgment be **GRANTED IN PART**, and **DENIED IN PART**, because while the ALJ complied with the Appeals Council's remand order, the ALJ 1) did not evidence sufficient consideration of Dr. Lauderman's October 2003 report and Dr. Lim's October 2003 report, and 2) failed to sufficiently explain his rationale for finding Claimant's spinal impairment did not meet or equal Listing 1.04.

    2. Commissioner's Motion for Summary Judgment be **GRANTED IN PART**, and **DENIED IN PART**, for the same reasons set forth above.

## II. Facts

A. Procedural History

Claimant filed an application for Supplemental Security Income and Disability Insurance Benefits on March 9, 2000 and March 13, 2000, respectively, alleging disability since December 2, 1998 due to herniated disc at L4-5, chronic pain, left foot drag, shortness of breath, and depression. (Tr. 180, 197, 204). The applications were denied, initially and upon reconsideration. A hearing was held before an ALJ on July 12, 2001. (Tr. 609). On October 24, 2001, the ALJ issued a decision adverse to Claimant. (Tr. 71). Claimant requested review by the Appeals Council. On December 19, 2002, the Appeals Council remanded the case to the

ALJ for further hearing.  (Tr. 62).  A subsequent hearing was held May 6, 2003.  (Tr. 642).  On June 4, 2003, the ALJ issued a second decision adverse to Claimant.  (Tr. 85).

On June 24, 2003, Claimant filed a concurrent application for DIB.  On October 29, 2003, the state agency initially reviewed Claimant's application and allowed Claimant's concurrent claim with a procedural onset date of June 5, 2003.  On November 16, 2004, the Appeals Council affirmed the allowance of Claimant's June 24, 2003 application, vacated the ALJ's June 4, 2003 decision, and remanded the case to the ALJ for reconsideration of the period prior to June 5, 2003.  (Tr. 103).

A final hearing before the ALJ was held March 29, 2005.  (Tr. 674).  On May 6, 2005, the ALJ issued a third decision unfavorable to Claimant.  (Tr. 24).  Specifically, the ALJ found Claimant was not disabled beginning December 2, 1998 through June 4, 2003.  Claimant appealed the ALJ's decision to the Appeals Council, and was denied.  Claimant thereafter filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 51 years old on the date of the July 12, 2001 hearing; 53 years old on the date of the May 6, 2003 hearing; and 55 years old on the date of the March 29, 2005 hearing.  Claimant obtained his GED and has prior work experience as a maintenance machine setup, and a police officer.  (Tr. 181, 186, 225).

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability: December 2, 1998 - June 4, 2003.

**Charlotte Uphold, SSA Field Office Employee, 11/7/01 (Tr. 241)**
Observations:
      The Claimant had difficulty with sitting and walking.
      He has to stand 2 or 3 times during the interview to relieve the pain in his back (or at
      least help it). When he walks he limps and one foot drags a little.

**A el Shaar, M.D., Advanced Imaging CT Scanning, 4/12/90 (Tr. 314)**
Plain films of the lumbar spine.
Impression: Bulging L3-L4 disc annulus without herniating. Bulging L4-L5 disc annulus with
probable herniating on the right. Findings suggestive but not diagnostic of minimal central
herniating of L5-S1 disc. Narrowed disc spaces between L3 and S1. Transitional L5 and
changes at the facet joint of L5-S1 junction as described.

**Robert Wolfman, M.D., Disability Evaluations, Inc., 9/21/93 (Tr. 315)**
Assessment: Based on the 3rd edition revised, of the A.M.A. Guides to the Evaluation of
Permanent Impairment, Gary Brady has an 19th whole person impairment due to this claim.
There is no increase in impairment since the previous award of 19% in 1991. There appeared to
be some claimant magnification.

**Barry Barrows, M.D., David Memorial Hospital, 6/5/99 (Tr. 318)**
Complaints: Back pain.
Impression: 1. Acute sciatic; rule out lumbar disc disease; rule out ruptured disc.

**Charles M. Pagoda, D.O., West Virginia Disability Determination Service, 5/6/100 (Tr. 320)**
Spine: Spine curvature is normal; Palpitation and percussion of the cervical spinous processes
reveal no tenderness. Palpation of the paracervical muscles reveals no tenderness, swelling, or
redness. The cervical spine shows normal range of motion without any restrictions.
Neurological: Neurologically, the patient is grossly intact without any focal defects. . . . The
patient did not appear to have any sensory deficits. . . . There is no evidence of any muscle
atrophy or wasting. . . . The patient was able to stand on his toes, walk, heel-to-toe tandem, and
stand on one leg without any difficulty. He stated he couldn't stand on his left heel, but had no
problems standing on the right heel.
Impression: 1) Chronic and acute low back pain; a) Herniated disc with L5 nerve root
radiculopathy versus sciatica.
Summary: . . . His left hip and knee were somewhat decreased in motor strength at 4/5. The
patient didn't have any evidence of any loss of strength in his right leg. . . . He had no gait defect
and did not require an ambulatory aid. Sensory was intact. Otherwise, his back appeared to be
normal.

**Dennis G. Peterson, PA-C, 2/25/99 (Tr. 327)**
Impression: Left SI joint pain.

**Fulvio Franyutti, M.D., State Agency Physician, 6/1/00 (Tr. 328)**
Exertional Limitations

Occasionally lift and/or carry - 20 pounds
Frequently lift and/or carry - 10 pounds
Stand and/or walk  - about 6 hours in an 8-hour workday.
Sit - about 6 hours in an 8 hour workday
Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations: Climbing/Balancing/Stooping/Kneeling/Crouching/Crawling: occasionally
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Avoid concentrated exposure of extreme cold.
Symptoms: The symptoms are attributable, in your judgment, to a medically determinable
impairment. Pain of back and lower extremities considered and RFC reduced to light because of
symptoms __ pain.

**Henry Scovern, M.D., Office of Disability, Office of Medical Evaluation, 7/22/00 (Tr. 336)**
Impression: The applicant may have some LBP which, according to the 6/99 note, would appear
to be intermittent.  One suspects that any findings of radiculopathy are old, dating to the original
incident (applicant alleged onset of back pain in 1/83!), and only questionably pertinent at
present.  The current examination was well-documented and was mainly remarkable for signs of
malingering.  It is likely that no persistent, severe, back complaint is present.  Nevertheless,
under PU, with a medically determinable impairment severity and RFC are considered
"judgmental" and can not be modified at this review level.

**Sharon Joseph, Ph.D., 11/3/00 (Tr. 343)**
Adult Mental Profile
Diagnostic Impression:
> Axis I: Adjustment Disorder with Depressed Mood; Pain Disorder associated with
> > Physical and Psychological Conditions
> Axis II: Borderline Intellectual Functioning.
> Axis III: Back condition, per patient report.

Concentration: Concentration, as reflected on the WAIS-III, is considered to be within normal
limits.
Judgment: Judgment, as reflected on the WAIS-III, is considered to be mildly impaired.
Memory: Immediate memory is considered to be within normal limits.  Recent memory is
considered to be mildly impaired.  Remote memory is considered to be within normal limits.
Persistence: The claimant's persistence was considered to be only fair.
Pace: The claimant's pace was considered to be within normal limits.
Prognosis: Prognosis psychologically, with treatment for his depression and pain management
and stress management, is considered to be fair.  Prognosis physically can only be determined by
a physician.
Capability: The claimant is capable of managing his benefits.

**Hugh Brown, M.D., DDS Physician, 11/22/00 (Tr. 348)**
Exertional Limitations

Occasionally lift and/or carry - 20 pounds
Frequently lift and/or carry - 10 pounds
Stand and/or walk  - about 6 hours in an 8-hour workday.
Sit - about 6 hours in an 8 hour workday
Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations: Climbing/Balancing/Stooping/Kneeling/Crouching/Crawling: frequently
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
Environmental Limitations: Avoid concentrated exposure of vibration.

**Joseph Kuzniar, Ed.D., DDS Physician, 11/27/00, (Tr. 356)**
Psychiatric Review Technique
Medical Dispositions:
RFC Assessment Necessary
Coexisting nonmental Impairment(s) that requires referral to another medical speciality.
Category(ies) upon which the medical disposition is based:
12.02 Organic Mental Disorders BIF
12.04 Affective Disorders
12.07 Somatoform Disorders
Organic Mental Disorders: A medically determinable impairment is present that does not
precisely satisfy the diagnostic criteria above: Disorder BIF.
Affective Disorders:
Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as
evidenced by at least one of the following: 1) depressive symptoms evidenced by at least
four of the following: sleep disturbance, thoughts of suicide.
A medically determinable impairment is present that does not precisely satisfy the
diagnostic criteria above: Adjustment disorder with depressed mood ___.
Somatoform Disorder: A medically determinable impairment is present that does not precisely
satisfy the diagnostic criteria above: pain disorder associated with physiological and
psychological conditions.
Functional Limitation for Listings 12.02, 12.04, 12.07
Restriction of Activities of Daily Living: Mild
Difficulties in Maintaining Social Functioning: Moderate
Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
Episodes of Decompensation, each of extended duration: None
"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria

**Joseph Kuzniar, Ed.D., DDS Physician, 11/27/00 (Tr. 370)**
Understanding and Memory:
Ability to remember locations and work-like procedures: not significantly limited
Ability to understand and remember very short and simple instructions: not significantly limited
Ability to understand and remember detailed instructions: moderately limited
Sustained concentration and persistence

Ability to carry out very short and simple instructions: not significantly limited
Ability to carry out detailed instructions: moderately limited
Ability to maintain attention and concentration for extended periods: moderately limited
Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: not significantly limited
Ability to sustain an ordinary routine without special supervision: not significantly limited
Ability to work in coordination with or proximity to others without being distracted by them: not significantly limited
Ability to make simple work-related decisions: not significantly limited
Ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistence pace without an unreasonable number and length of rest periods: moderately limited.

<u>Social Interaction</u>
Ability to interact appropriately with the general public: not significantly limited
Ability to ask simple questions or request assistance: not significantly limited
Ability to accept instructions and respond appropriately to criticism from supervisors: moderately limited
Ability to get along with coworkers and peers without distracting them or exhibiting behavioral extremes: not significantly limited
Ability to maintain socially appropriate behavior and to adhere to basic standards and cleanliness: not significantly limited

<u>Adaptation</u>
Ability to respond appropriately to changes in the work setting: moderately limited
Ability to be aware of normal hazards and to take appropriate precautions: not significantly limited
Ability to travel in unfamiliar places or use public transportation: not significantly limited
Ability to set realistic goals or make plans independently of others: not significantly limited

<u>Functional Capacity Assessment</u>: The claimant alleges being depressed and he obtained a CE diagnosis of __ disorder with depressed mood.  He also carries a diagnosis of pain disorder and BIF.  He can't __ on 1-00 and currently takes no __. His ___, social skills, ___, and MSE performance were not in the markedly limited range. He retains the capacity to at least engage in simple routine works with ___ and social skills ___.


**<u>Lucas Pavlovich, M.D., 12/7/00 (Tr. 376)</u>**
<u>Physical Capacity Evaluation</u>
In an 8 hour workday, claimant can
      At one time: sit 1 hour, stand 1 hour, walk 1 hour
      During entire 8-hour day: sit 2 hours, stand 2 hours, walk 2 hours.
Claimant can lift
      up to 5 pounds frequently
      6-10 pounds frequently
      11-20 pounds never
      21-25 pounds never
      26-50 pounds never

       51-100 pounds never
Claimant can use hand for repetitive actions such as
       Simple grasping: Right, yes; left, yes.
       Pushing and pulling arm controls: Right, yes; left, yes.
       Fine manipulation: Right, yes; left, yes.
Claimant is able to
       Bend - Occasionally
       Squat - Not at all
       Crawl - Not at all
       Climb  - Not at all
       Reach - Frequently
Restrictions of activities
       Unprotected heights - moderate
       Being around moving machinery - mild
       Exposure to marked changes in temperature and humidity: none
       Driving automotive equipment: mild
       Exposure to dust, fumes, and gases: none

**Lucas Pavlovich, M.D., 1/18/00 (Tr. 379)**
<u>Diagnoses</u>: SI joint injury; L4-L5 disc herniating.

**Lucas Pavlovich, M.D., 7/8/99 (Tr. 381)**
<u>Assessment</u>: Left sided L4/L5 disc.

**Lucas Pavlovich, M.D., 10/22/98 (Tr. 382)**
<u>Assessment</u>: lumbar strain.

**Lucas Pavlovich, M.D., 2/11/98 (Tr. 383)**
<u>Assessment</u>: Left SI joint injury.

**Lucas Pavlovich, M.D., 6/21/99 (Tr. 384)**
MRI Lumbar without contrast.
<u>Impression</u>: Left posterior L4-5 herniated disc, correlation with left L5 radiculopathy is suggested.

**Robert J. Klein, Ed.D., Family and Marital Counseling Center, 4/5/01 (Tr. 385)**
This date I saw Mr. Brady for a psychological evaluation.  It became evident through testing and observation that Mr. Brady is experiencing extremely high levels of both anxiety and depression. He informed me that he was taking 20 mg of Paxil a day.
I am asking him to contact you to have the Paxil increased from 20 to 40 mg daily.  He should be observed and if the anxiety and depression do not ameliorate, it may be necessary to either increase the Paxil again, add an additional medication or change the medication.

**Robert J. Klein, Ed.D., Family and Marital Counseling Center, 4/5/01 (Tr. 386)**

<u>Clinical Impressions</u>: Mr. Brady appeared to meet the DSM-IV criteria for a Major Depressive Disorder, Severe, Chronic, w/o psychotic features, a generalized anxiety disorder, and a pain disorder associated with physical and psychological conditions. While his full scale IQ appeared to be at a level of mild mental retardation, it would more likely be at the borderline level - still a significant factor with the mental disorders for successful employment. He appeared to not be employable at this time.

<u>Diagnoses</u>:

Axis I: Major depressive disorder, severe, chronic, w/o psychotic features.

Generalized anxiety disorder.

Pain disorder associated with physical and psychological conditions.

Axis II: Borderline Intellectual Functioning

Axis III: see medical records.

<u>Recommendations</u>: Mr. Brady appeared to have significant psychological problems of a long-standing duration. His condition and medication should be reviewed. Psychotherapy would be recommended. The severe levels of both depression and anxiety would significantly reduce the likelihood of any successful employment. The pain that he was intermittently experiencing during testing did not appear to be contrived, and should require further treatment and analysis as a factor for any future employment.

**Robert J. Klein, Ed.D., Family and Marital Counseling Center, 4/5/01 (Tr. 391)**

Medical Assessment of Ability to do Work-Related Activities

Making occupational adjustments

Follow work rules: fair

Relate to co-workers: fair

Deal with the public: fair

Use judgment: fair

Interact with supervisors: poor

Deal with work stresses: poor

Function independently: fair

Maintain attention/concentration: poor

Making performance adjustments

Understand, remember, and carry out complex job instructions: poor

Understand, remember and carry out detailed, but not complex job instructions: fair

Understand, remember and carry out simple job instructions: good

Making personal-social adjustments

Maintain personal appearance: fair

Behave in an emotionally stable manner: poor

Relate predictably in social situations: poor

Demonstrates reliability: fair

Capability to manage benefits

Can the individual manage benefits in his or her own best interest? Yes

**Robert Klein, Ed.D., DDS Physician, 4/5/01, (Tr. 394)**

<u>Psychiatric Review Technique</u>

Medical Dispositions: Meets Listings 12.04 and 12.06
Category(ies) upon which the medical disposition is based:
     12.04 Affective Disorders
     12.06 Anxiety related disorders
Affective Disorders:
     Disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by at least one of the following: 1) depressive symptoms evidenced by at least four of the following: anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentration or thinking.
Anxiety-Related Disorders: Anxiety as the predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by at least one of the following: 1) Generalized persistent anxiety accompanied by three of the following: motor tension, autonomic hyperactivity, apprehensive expectation.
Functional Limitation for Listings 12.04, 12.06
     Restriction of Activities of Daily Living: Moderate
     Difficulties in Maintaining Social Functioning: Moderate
     Difficulties in Maintaining Concentration, Persistence or Pace: Moderate
     Episodes of Decompensation, each of extended duration: Three
"C" Criteria of the Listings: Evidence does not establish the presence of the "C" Criteria

**Jeffrey Harris, D.O., Davis Memorial Hospital, 6/11/98 (Tr. 411)**
Impression: 1) Degenerative joint disease of the back; 2) Sciatica.

**Dennis G. Peterson, PA-C, 6/7/01 (Tr. 418)**
Impression: 1) Radicular symptoms from L4/5 disc herniating and nerve root irritation.

**Lucas J. Pavlovich, M.D., 1/25/01 (Tr. 419)**
Assessment: 1) Radicular symptoms from an L4/5 sided disc herniating and nerve root irritation.

**Lucas J. Pavlovich, M.D., 8/10/00 (Tr. 421)**
Assessment: 1) Left sided radicular symptoms with sensory as well as motor deficit consistent with his herniated disc on the left at L4/5.

**Lucas J. Pavlovich, M.D., 3/9/00 (Tr. 422)**
Assessment: 1) Status post herniation at L4/5.

**Lucas J. Pavlovich, M.D., 12/2/99 (Tr. 423)**
On exam today, he ambulates with a limp.

**Stephen Lau, M.D., 2/19/01 (Tr. 425)**
Impression: 1) Lipoma of the back of neck, 2) History of depression; 3) Prolapse of lumbar disc.

**Joseph Kuzniar, Ed.D., DDS Physician, 11/27/00 (Tr. 427)**
Psychiatric Review Technique
Medical Dispositions: Impairment(s) not severe; coexisting nonmental impairment(s) that
    requires referral to another medical specialty.
Category(ies) upon which the medical disposition is based:
    12.04 Affective Disorders

**Kip Beard, M.D., Tri-State Occupational Medicine, Inc., 3/14/02 (Tr. 442)**
Muscoskeletal:
    Cervical Spine: Examination of the cervical spine reveals no tenderness over the spinous
    processes.
    Arms: The shoulders, elbows and wrists are non-tender.
    Hands: Examination of the hands reveals no tenderness, redness, warmth or swelling.
    There is full range of motion in all joints of the fingers of both hands.
    Knees: Examination of the knees reveals no tenderness, redness, warmth, swelling,
    effusion, laxity, or crepitations. Extension and flexion of both knees is normal.
    Ankles and feet: Examination of the feet and ankles are non-tender and there is no
    redness, warmth, swelling.  Plantarflexions and dorsiflexion of the ankles are normal.
    LS Spine and Hips: Examination of the dorsolumbar spine reveals diminished lumbar
    lordosis. There is pain with range of motion testing.
    Neurologic Examination: On neurological examination, there is collapsing weakness in
    the left lower extremity. The claimant states he is not able to extend the left great toe.  He
    tends to keep the left great toe flexed throughout the evaluation.  This seems to be
    consistent. . . . The claimant can stand on the heels and toes.  He exhibits some
    diminished evaluation on the left side.  The claimant appears a bit unbalanced when heel-
    to-toe walking.  He is able to squat and arise from a squatted position, but reports back
    discomfort.
Impression:
    1) Chronic low back pain. a) Chronic lumbosacral strain; b) Reported history of
    degenerative disc disease; c) Possible left-sided lumbar nerve root irritation without a
    definite well-defined lumbar radiculopathy.
Summary: The claimant is a 52-year old male with chronic back pain.  On examination, there is
diminished motion associated with back pain.  There is a large discrepancy on the tolerated
seated to supine straight left raising test, but a consistent report of leg pain when doing so.  There
is collapsing weakness as noted above in the left lower extremity without focal sensory
discrepancies.  Deep tendon reflexes appear symmetric.  There may be some nerve root irritation
without a definite radiculopathy present.  The claimant's gait is without limp.  The claimant
mentions back pain when arising from a seated position or climbing up and down from the
examination table, he required no ambulatory aids.

**Eli Rubenstein, M.D., 3/14/02 (Tr. 448)**
Impression: Normal lumbar spine except for osteoarthritis changes.  Slight narrowing L-5 S-1.

**Cynthia Osborne, DDS Physician, 04/18/02 (Tr. 448)**

Physical Residual Functional Capacity Assessment
Exertional Limitations
> Occasionally lift and/or carry - 20 pounds
> Frequently lift and/or carry - 10 pounds
> Stand and/or walk  - about 6 hours in an 8-hour workday.
> Sit - about 6 hours in an 8 hour workday
> Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations: Climbing/Balancing/Stooping/Kneeling/Crouching/Crawling: occasionally
Manipulative Limitations: none established
Visual Limitations: none established
Communicative Limitations: none established
> Environmental Limitations: Avoid concentrated exposure of extreme cold, extreme heat,
> wetness, hazards.

Symptoms: History of back injury - ___ - Uses tens unit no surgery - MRI shows ___; strength good; minimal LE findings but not c/w radicular impingement –; ADLs with minimal assistance from his wife; vomiting on occasions, related to his meds.  Reduced RFC to light based on c/o and findings.

**Dr. Hart, M.D., West Virginia Department of Health and Human Resources, 1/18/02 (Tr. 460)**
General Physical
-Is applicant able to work full time at customary occupation or like work? No. Unable to lift, sit or stand for extended periods of time.
-Is applicant able to perform some other full time work? No. Same.
-Check what types of work applicant can perform: Sedentary
-What work situations, if any, should be avoided? Lifting, sitting, or standing for long periods of time.
-Duration of inability to work full time: One year

**Lucas Pavlovich M.D., 6/13/02 (Tr. 469)**
On exam today, the patient had no clinical change.

**Lucas Pavlovich M.D., 5/2/02 (Tr. 470)**
Assessment: Lumbar pain.

**Lucas Pavlovich M.D., 2/1/02 (Tr. 471)**
Assessment: Left sided disc herniated.

**Lucas Pavlovich M.D., 10/18/01 (Tr. 472)**
Assessment: Lumbar strain and herniated disc.

**Dr. Simmons, M.D., DDS Physician, 8/13/02 (Tr. 476)**
Physical Residual Functional Capacity Assessment
Exertional Limitations

Occasionally lift and/or carry - 20 pounds
Frequently lift and/or carry - 10 pounds
Stand and/or walk  - about 6 hours in an 8-hour workday.
Sit - about 6 hours in an 8 hour workday
Push and/or pull - unlimited, other than as shown for lift and/or carry

Postural Limitations: Climbing/Balancing/Stooping/Kneeling/Crouching/Crawling: occasionally
Manipulative Limitations: none established
Visual Limitations: far acuity - limited.
Communicative Limitations: none established
Environmental Limitations: Avoid concentrated exposure of extreme cold, extreme heat, wetness, vibration, hazards.
Symptoms: Claimant with LBP secondary to injury.  MRI shows DDD has not had surgery and uses a TENS unit.  Pain persists in low back, left hip and leg and depression under treatment. Claimant alleges pain requiring strong anti-pain rx.  Give away weakness of the left ankle.  Due to MER and chronic pain RFC reduced to light.

**James Capage, Ph.D., DDS Physician,  8/20/02 (Tr. 485)**
Psychiatric Review Technique
Medical Dispositions: Impairment(s) not severe.
Category(ies) upon which the medical disposition is based:
    12.04 Affective Disorders
Affective Disorders: A medically determinable impairment is present that does not precisely
    satisfy the diagnostic criteria above: depression.
Functional Limitation for Listings 12.04
    Restriction of Activities of Daily Living: Mild
    Difficulties in Maintaining Social Functioning: Mild
    Difficulties in Maintaining Concentration, Persistence or Pace: Mild
    Episodes of Decompensation, each of extended duration: None
Consultant's Notes: ADL's __/CP&P not significantly reduced by depression.

**Elliot Rotman, Ph.D., 9/18/02 (Tr. 499)**
Medical consultant's review of psychiatric review technique form: The 52 year old claimant alleges LBP and related functional limitations.  He also alleges depression. The depression has been treated by his PCP with Paxil 20 mg BID.  A 7/12/02 note indicates it had improved with medication.  While the claimant has experienced depression for over a year, it does not appear to significantly affect his adaptive functioning. The DDS's assessment that the condition is non-severe is reasonable.

**Sharon Joseph, Ph.D., 2/21/03 (Tr. 504)**
Mental Status
-The claimant is alert, oriented x 3, and generally cooperative. . . .  There were no psychomotor disturbances noted. Affective expression was flat.  Insight appears fair.
Judgment: Judgment is considered to be mild to moderately impaired.
Concentration: Concentration is considered to be mildly impaired.
Memory: Immediate memory is considered to be within normal limits.  Recent memory is

considered to be markedly impaired.  He was only able to repeat 1 out of 4 objects after 30 minutes.  Remote memory appears to be within normal limits.

Socialization: . . . Due however to his reported restricted social activities, socialization is considered to be mildly impaired.

Diagnostic Impression:

Axis I:

      Major Depressive Episode, recurrent, moderate 296.32

      R/O Alcohol Abuse

      Pain Disorder with both physical and psychological factors 307.89.

Axis II: Borderline Intellectual Functioning per previous medical record V62.89.

Axis III: Back condition with deteriorated discs, chronic back pain, hyperlipidemia per

      claimant's report.

Prognosis: Medical prognosis can only be determined by a physician.  Psychological prognosis is considered to be fair with intensive psychiatric treatment for depression.

Capability: The claimant is capable of managing his benefits.


**Sharon Joseph, Ph.D., 3/11/03 (Tr. 509)**

Medical Assessment of Ability to Do Work-Related Activities (Mental)

Medical Assessment of Ability to do Work-Related Activities

Making occupational adjustments

      1.Follow work rules: fair

      2.Relate to co-workers: fair

      3.Deal with the public: fair

      4.Use judgment: fair

      5.Interact with supervisors: fair

      6.Deal with work stresses: poor

      7.Function independently: fair

      8.Maintain attention/concentration: fair

      9.Describe any limitations and include the medical/clinical findings that support this assessment: #6 is seriously limited due to patient's depression and chronic pain disorder. All others are somewhat limited due to mild impairments in attention/concentration, judgment per mental status evaluation, and patient's depressive disorder and

interpersonal   emotional withdrawl tendencies.

Making performance adjustments

      1.Understand, remember, and carry out complex job instructions: poor

      2.Understand, remember and carry out detailed, but not complex job instructions: poor

      3.Understand, remember and carry out simple job instructions: fair

      4. Describe any limitations and include the medical/clinical findings that support this assessment: Patient's recent memory is markedly impaired per MS eval and this would affect #1 and #2 significantly.  This condition may improve with intense therapy for depression.

Making personal-social adjustments

      1.Maintain personal appearance: good

      2.Behave in an emotionally stable manner: fair

3.Relate predictably in social situations: fair
4.Demonstrates reliability: fair
5. Describe any limitations and include the medical/clinical findings to support this assessment: #2,3,4,5 limited due to patient's depressive condition.
Capability to manage benefits
Can the individual manage benefits in his or her own best interest? Yes

**Kip Beard, M.D., 2/24/03 (Tr. 512)**
Impression:
1) Chronic lower back pain.
a. History of lumbosacral strain.
b. Probable myofascial pain superimposed upon degenerative disc disease.
c. Possible left lumbar nerve regurgitation.
2) Abdominal discomfort with nausea, etiology unclear.
Summary: The claimant is a 53-year-old male with a history of chronic lower back pain. Examination of the back today reveals some limited motion associated with pain. There is tenderness present, may be some evidence of left-sided nerve regurgitation. Left Achilles appears diminished compared to the right. There were findings which seem most compatible with L5 and S1 distribution in the left leg but some variable manual muscle testing. There may be some slight great toe extension weakness, but variable effort on dorsiflexion on the left side. There is no atrophy. The claimant ambulates with no appreciable limp and some difficulty with functional testing associated with back pain.

In regard to abdominal and nausea discomfort, abdominal examination reveals tenderness without distension. No appreciable hepatosplenomegaly. Abdomen revealed no ascites present.

**Kip Beard, M.D., 2/20/03 (Tr. 517)**
Medical Assessment of Ability to do Work-Related Activities (Physical)
1. Are lifting/carrying affected by impairment? Yes.
Individual can lift and/or carry: 40 pounds
Maximum occasionally: 40
Maximum frequently: 20
2. Are standing/waling affected by impairment? Yes
Individual can stand and/or walk 6 hours in 8 hour workday.
Total? 6
Without interruption? 2
3. Is sitting affected by this impairment? Yes
Individual can sit 6 hours in an 8 hour workday.
Total: 6
Without interruption: 2
4. How often can the individual perform the following postural activities?
Climb/balance/stoop/crouch/kneel/crawl: frequently
5. Are the following physical functions affected by the impairment?
Handling/Feeling/Seeing/Hearing/Speaking: No

Reaching/Pushing/Pulling: Yes
6. Are there environmental restrictions caused by the impairment?
Heights/moving machinery/chemicals/dust/noise/fumes: No
Temp extremes/humidity/vibration: Yes

**Lucas Pavlovich, M.D., 3/6/03 (Tr. 526)**
<u>Assessment</u>: Lumbar spine pain as well as disc herniating.

**Lucas Pavlovich, M.D., 1/23/03 (Tr. 527)**
<u>Assessment</u>: Lumbar degenerative changes and herniated disc.

**Lucas Pavlovich, M.D., 3/6/03 (Tr. 528)**
<u>Assessment</u>: Continued low back pain with disc herniating.

**Lucas Pavlovich, M.D., 10/17/02 (Tr. 529)**
<u>Assessment</u>: Lumbar disc and left leg radicular symptoms.

**Lucas Pavlovich, M.D., 8/1/02 (Tr. 531)**
<u>Assessment</u>: Radicular symptoms.

**Stanford Fluber, M.D., 11/18/02 (Tr. 532)**
<u>Diagnostic Impression</u>: Chronic low back pain with L5-S1 radiculopathy.

**Fouad Abdalla, M.D., 7/3/02 (Tr. 539)**
MRI Lumbar w/o contrast
<u>Result</u>: MRI of the lumbar spine performed with 1.5 Tesla magnet and compared to the examination of 1999 and shows again the herniating of disc at L4-5 on the left side. There is also noticed central herniating of the protrusion of L3-4 with arthritic changes of the facet joint with arthritic changes of the facet joints causing relative narrowing through the spinal canal. There is seen no change from previous examination. No other herniating demonstrated in this study.

**Lucas Pavlovich, 6/5/03 (Tr. 544)**
<u>Assessment</u>: Lumbar spine pain and disc herniating.

**Dr. Hart, M.D., West Virginia Department of Health and Human Resources, 1/17/03 (Tr. 547)**
<u>General Physical</u>
-Is applicant able to work full time at customary occupation or like work? No. Pain in leg and low back.
-Is applicant able to perform some other full time work? No. Unable to stand or work for extended periods of time.
-What work situations, if any, should be avoided? Heavy lifting ___.
-Duration of inability to work full time: One year

**Dr. Stephen High, M.D., 7/9/03 (Tr. 550)**
Routine Abstract Form Physical
Diagnoses: chronic back pain.


**Kip Beard, M.D., 9/15/03 (Tr. 556)**
Internal Medicine Examination
Impression:
1. Chronic lower back pain. a) history of lumbar strain.
2. Chronic lumbar myofascial pain superimposed upon degenerative disc disease with left radicular symptoms.
3. Shortness of breath. a) history of prior tobacco use; b) consider cardiopulmonary deconditioning; c) consider COPD.
4. History of gout, stable.
5. Chronic nausea and vomiting, etiology uncertain.
Summary: The claimant is a 53 year old male with history of chronic back pain. Examination today reveals some limited associated with pain and tenderness. Straight leg raising is negative. There were some sensory discrepancies on the left leg that are not limited to a single nerve root distribution. There is some collapsing weakness of the left foot. I am unable to definitely identify a definite left radiculopathy today.
There is also a history of gout. There is no evidence of an acute gout flare. There are no tophi present.
There is also a history of shortness of breath and prior history of tobacco use. Examination today reveals lungs clear to auscultation. There was no exertional dyspnea, no accessory muscle recruitment and no peripheral clubbing or cyanosis.


**Thomas Lauderman, D.O., 10/17/03 (Tr. 563)**
Physical Residual Functional Capacity Assessment
Exertional Limitations
> Occasionally lift and/or carry - 20 pounds
> Frequently lift and/or carry - 25 pounds
> Stand and/or walk  - about 2 hours in an 8-hour workday.
> Sit - about 6 hours in an 8 hour workday
> Push and/or pull - unlimited, other than as shown for lift and/or carry
Postural Limitations: Climbing/Balancing/Stooping/Kneeling/Crouching/Crawling: occasionally
Manipulative Limitations: none established
Visual Limitations: none established.
Communicative Limitations: none established
Environmental Limitations: Avoid concentrated exposure of extreme cold, extreme heat, hazards.
Symptoms: Medical evidence indicates claimant is sedentary. Takes percodan and soma for pain. Reduced range of motion. Abnormal gait. Reduced ADLs. History of herniated disc. RFC reduced to sedentary. No __ for herniated disc.

**DDS Physician, 10/17/03 (Tr. 571)**

Psychiatric Review Technique

Medical Dispositions: RFC Assessment necessary.

Category(ies) upon which the medical disposition is based:

       12.02 Organic mental disorders

       12.04 Affective Disorders

       12.06 Anxiety-related disorders

       12.07 Somatoform disorders

       12.09 Substance addiction disorders

Organic Mental Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: BIF

Affective Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: MDD

Anxiety-Related Disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: ___ disorder.

Somatoform disorders: A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: pain disorder

Substance addiction disorders: Etoh dependence, MJ dependence.

Functional Limitation for Listings 12.02, 12.04, 12.06, 12.07, 12.09.

       Restriction of Activities of Daily Living: Moderate

       Difficulties in Maintaining Social Functioning: Moderate

       Difficulties in Maintaining Concentration, Persistence or Pace: Moderate

       Episodes of Decompensation, each of extended duration: None

"C" Criteria of the Listings: Evidence does not establish the presence of the "C" criteria.

Consultant's Notes: ALJ - 6/03 - I concur with ALJ decision that he has no severe mental impairment.


**DDS Physician, 10/17/03 (Tr. 585)**

Mental RFC Assessment

Understanding and Memory:

Ability to remember locations and work-like procedures: moderately limited

Ability to understand and remember very short and simple instructions: not significantly limited

Ability to understand and remember detailed instructions: moderately limited

Sustained concentration and persistence

Ability to carry out very short and simple instructions: not significantly limited

Ability to carry out detailed instructions: moderately limited

Ability to maintain attention and concentration for extended periods: moderately limited

Ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: moderately limited

Ability to sustain an ordinary routine without special supervision: no evidence of limitation in this category

Ability to work in coordination with or proximity to others without being distracted by them: not significantly limited

Ability to make simple work-related decisions: not significantly limited

Ability to complete a normal work-day and workweek without interruptions from
psychologically based symptoms and to perform at a consistence pace without an
unreasonable number and length of rest periods: moderately limited.

<u>Social Interaction</u>
Ability to interact appropriately with the general public: not significantly limited
Ability to ask simple questions or request assistance: not significantly limited
Ability to accept instructions and respond appropriately to criticism from supervisors:
moderately limited
Ability to get along with coworkers and peers without distracting them or exhibiting behavioral
extremes: no evidence of limitation in this category: no evidence of limitation in this
category
Ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and
cleanliness: not significantly limited

<u>Adaptation</u>
Ability to respond appropriately to changes in the work setting: moderately limited
Ability to be aware of normal hazards and to take appropriate precautions: not significantly
limited
Ability to travel in unfamiliar places or use public transportation: moderately limited
Ability to set realistic goals or make plans independently of others: moderately limited
<u>Functional Capacity Assessment</u>: 53 year old alleges nervous, depression.  His PRTF provides
an overview of his mental condition (hx, dx, etc).  His mental functioning is assessed in Section I
of MI, MRFC.  Claimant's residual mental capacity is consistent with routine competitive
employment involving short and simple instructions with low interpersonal and pressure
demands.


**Thomas Stein, Ed.D., 9/18/03 (Tr. 589)**
<u>Mental Status Examination</u>
<u>Diagnoses</u>:
Axis I:
      1. Panic disorder with agoraphobia.
      2. Alcohol dependence.
      3. Cannabis dependence.
      4. Major depression, single episode, non-psychotic.
      5. Pain disorder associated with general medical condition and psychological factors.
Axis II: Borderline intellectual functioning.
Axis III: Chronic back pain with sciatica; difficulty with ambulation, difficulty gripping and
holding objects, and also reports hypercholesterolemia and gout.
<u>Prognosis</u>: poor
<u>Capability</u>: In the event if disability benefits are awarded, this claimant is felt to be in need of
fiscal agent because of the chronicity of his alcohol and cannabis dependence problems.


**DDS Physician, 10/2/03 (Tr. 595)**
<u>Physician's Physical Capacities Evaluation</u>

1. In an 8 hour workday, claimant can
   Sit 1 hour
   Stand/walk 1 hour
   Sit for 10 min at a time without needing to change position.
   Stand for 10 minutes at a time without needing to change position.
   Limitations due to pain.
   The claimant will need the flexibility to change positions: frequently
2. Claimant can lift
   Up to 10 pounds: occasionally
   11-20 pounds: never
   21-50 pounds: never
   51-100 pounds: never
   Limitation due to pain
3. Claimant can carry
   Up to 10 pounds: occasionally
   11-20 pounds: never
   21-50 pounds: never
   51-100 pounds: never
   Limitation due to pain
4. Is there any evidence of any disorder that would limit in any way repetitive action involving:
   Pushing and pulling: Right, yes; left, yes.
   Simple grasping: Right, no; left, no.
   Fine manipulation: Right, no; left, no.
5. Is there any evidence of any disorder that would limit in any way the Claimant's use of his/her feet for repetitive movements as an operating foot controls?
   Right, yes; Left, yes; Both, yes.
   Limitation due to pain.
6. Claimant is able to
   Bend - Not at all
   Squat - Not at all
   Crawl - Not at all
   Climb  - Not at all
   Reach above - Not at all
   Stoop - Occasionally
   Kneel - Occasionally
7. Claimant can tolerate
   Exposure to unprotected heights: occasionally
   Being around moving machinery: occasionally
   Exposure to marked changes in temperature: frequently
   Driving automotive equipment: occasionally
   Exposure to dust, fumes, gases, smoke, and perfumes: not at all
   Exposure to noise: not at all.
   Limitations due to pain.
8. Objective signs of pain

X ray abnormality, muscle spasm, spinal deformity, disc abnormality.

9. Degree of pain reasonably related to the underlying condition is described by the Claimant as: severe (would preclude activity precipitating the pain).

10. Is the pain chronic? Yes

11. The claimant will need unscheduled interruptions of work routine to leave the work station to alleviate the pain during the day: frequently.

12. The claimant will probably miss work due to exacerbation of pain: frequently.

13. As a result of this condition and the attendant limitations, the claimant will probably be: unreliable.

**Lucas Pavlovich, 11/20/03 (Tr. 598)**

The status of Mr. Brady's condition is that he is currently incapacitated due to left L4/5 disc herniating and L5 nerve root radiculopathy.

I have reviewed the enclosed listing 1.04, which is consistent with his pathology. Specifically, the patient has evidence of nerve root compression characterized by neuro anatomic distribution of pain with limited motion of the spine, motor loss and sensory loss involving the lower back with a positive straight leg raise. . . . At this point, Mr. Brady will have a difficult time standing more than 1-2 hours throughout an eight hour work day and will likely need unscheduled work breaks as a result of his symptoms. His complaints are consistent with his medical evidence and I believe that his complaints are credible. I do not believe at this time that he is magnifying his symptoms. . . . I believe that sedentary work would be the highest work level, which Mr. Brady has been throughout a workday. I do not believe that he could lift anymore than ten pounds or sit for longer than six hours in an eight hour workday.

**Raymond Lim, M.D., 10/28/03 (Tr. 600)**

___ current RFC as per Dr. Lauderman is "sedentary."

D.      Testimonial Evidence

Testimony was taken at the three hearings. The following portions of the testimony from each hearing are relevant to the disposition of the case.

Hearing #1: July 12, 2001

[EXAMINATION OF CLAIMANT BY ALJ] (Tr. 621)

Q      Okay. Now I asked you about restrictions on activities. Any activities you're placing on yourself?

A      I can say it's hard for me to get around, I don't sleep at night time. I can't do what I use to do. I get cramps and constant pain, you might as well say 24 hours, 7 days a week.

Q     Okay.  Where are the cramps?

A     In my left leg, in the left leg from the knee down and in my feet, my toes.  Many times I just have to either jump up or sometimes if I'm in bed I have to jump up, you know.  I can't sit for a period of time.

Q     And the pain is where?

A     It's in my left hip and my left leg, my whole left leg is just completely numb.  I have no control of my left leg.

Q     Okay.  You mean no control or you mean no complete control?

A     No complete control you might say, I drag it.  When I want to put my shoe or my sock on I just have to grab it to hold it because it just like wanders off from me.

*          *          *

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 631)

Q     Okay.  Mr. Brady, how much - - you mentioned earlier that you have back problems on a daily basis, is that right?

A     Yes.

Q     How does that affect your ability to lift?

A     Well I don't think I can lift anything.  I can't bend to do it.

Q     How much weight can you lift do you think?

A     Maybe two, three, I don't know, two or three pounds maybe.

Q     Okay.  Are you able to be up on your feet very long?

A     No.

Q     How long are you on your feet at one time generally?

A       Well, maybe an hour.

Q       What about sitting?

A       It varies, you know, sometimes I can sit for an hour, sometimes it's 40 minutes, it just goes back and forth.

Q       What do you do for pain relieve?

A       I take medication that Dr. Pavlovick prescribes for me.

Q       Does that help?

A       I don't think it is anymore.

Q       Did it use to help?

A       It use to, it seemed to.

Q       Is your condition getting worse or staying the same?

A       I think it's getting worse.

Q       Do you ever get off of your feet to help the pain?

A       I try to.  Like I said, I'll lie down on the couch or the bed, you know, I've got to sometimes just jump because it just (INAUDIBLE).

Q       Do you lie down on a daily basis?

A       I try to, yes, because I don't sleep good at night time.

Q       How do you spend your day?

A       I don't know how to answer that, mostly starting at the walls or maybe try to get out on the porch or something a little bit, you know.

Q       I was going to ask you, do you get out of the house much?

A       I try to.

Q        Who does the chores around the house?

A        Such as there's no chores to be done, like such as what?

Q        Who does the inside chores?

A        My wife.

Q        Who does the yard and grass?

A        My next door neighbor, there's a kid over there that does it.

Q        Okay.  Is that something that you use to do?

A        I use to do them, yes.

Q        Did you use to have some hobbies that you enjoyed?

A        I use to like to hunt, I use to like to fish.

Q        Are you able to do those things today?

A        No, no.

                              *              *              *

Hearing #2: May 6, 2003

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 651)

Q        Okay.  Mr. Brady, what are the medical problems that you have that affect your

ability to work?

A        Well, constant pain in my left hip, in the left side of my hip right here, it's

constant pain.  My left leg is numb, it's completely numb and I drag my left foot, I trip a lot.

Every time I walk my left foot drags and I trip over it if I run after anything.

Q        Have you actually recently fallen?

A        Just about three days ago I fell on the sidewalk after going to my shed and busted

my finger right there, I tripped on my left foot.

Q        And you've got a cast there on your finger?

A        Yes.

Q        Now, what kind of - - how often do you have the pain?

A        Every day, 24 hours a day.

Q        Does it ever get better or worse?

A        It seems to get worse.

Q        Is there anything in particular that makes it worse?

A        Well, anything that I do, you know.

Q        Being on your feet makes it worse?

A        Anything I do, walk or being on my feet or anything.  Even if I sit, I can't sit too long, I can't lie too long.

Q        Is there anything that you do that makes it better?

A        Well, when I take the medication sometimes it seems to help it.

Q        Do you do things like get off your feet, sit down, lay down, recline, anything like that?

A        Yes, but it's just worse over time.

Q        Okay.  Do you lay down during the day?

A        Yes.

Q        How much time during the day do you think you spend laying down?

A        Five, six hours.

Q        Okay.

A        Maybe more.

Q        Are you changing positions?  When I say during the day I'm talking about during an eight hour work day.

A        Four, five, six times.

Q        Okay.

A        It just depends on the pain.

Q        Does that seem to help getting in that position, does that seem to help your back pain?

A        It does for a few seconds or a few minutes then you have to, you know, do something else, you know.

Q        Does your - - do you notice sometimes you drag your foot more than others?

A        Yes, I think I do.  I know I trip more at times sometimes than I do other times.

Q        How often are you falling?

A        Daily, I would say at least once a day or something.

Q        You mentioned that you trip over rugs in the house, that sort of thing?

A        Yes, sir.

Q        Are you - - and that's in your left leg?

A        My left leg.

Q        Now have the doctors indicated that you have - - what have they indicated your MRI will show?

A        Deteriorated disks, he said whatever, L4 and L5 disk, he said that's deteriorated and -    Q        Did he tell you you have a herniated disk?

A       Herniated, deteriorated, I don't know, I think it's - - it's one of the two, I don't know.

*          *          *

Q       What about standing in one particular place, like if you were in line?

A       Fifteen, twenty minutes and then I start to move.

Q       Is being on your feet worse than sitting or laying down?

A       I think being on the feet is worse, I think.

Q       Okay.

A       They're both about the same, I guess.

Q       What about walking?

A       I try to walk some but it bothers me, it just hurts my left side so bad.

Q       How do you try to walk, do you walk often?

A       Well I try to but, you know.

Q       Do you have a certain, I mean, do you walk down the road or walk around the yard?

A       Over to the mailbox or something, you know.

Q       When you say you walk do you mean you walk to the mailbox?

A       Yeah, sometimes.

Q       Okay.  How far is the mailbox?

A       I don't know, five, six hundred feet maybe.

Q       Okay.  That's down into your yard?

A       Yes, it is.

Q       Now, do you - - could you be on your feet for six hours out of an eight hour day?

A       No.

Q       Could you lift 10, 20 pounds throughout a day?

A       No, no.

Q       Could you handle a gallon of milk continuously through the day?

A       No, but everything I pick up I drop, I don't know, it just comes out of my hands, everything I pick up. I'm constantly dropping something.

*         *         *

Q       What do you do in the morning when you get up?

A       Well, I just get up and try to drink a cup of coffee or something and I don't like to take my medication until I try to eat something.

Q       Do you make breakfast?

A       No.

Q       Who makes breakfast?

A       My wife does.

Q       Now, how do you pass the time from say morning until lunch time?

A       Sitting in the house, you know, just staring at things, try to watch TV or something.

Q       Do you read, books, magazines?

A       No, no.

Q       Do you watch a lot of TV?

A       I try to.

Q	Okay.  What kinds of things do you like to watch?

A	Well, just mostly anything, you know, just anything, I don't really mind anything.

Q	Okay.  Who does the chores in the house?

A	My wife.

Q	Do you ever try to help her do those things?

A	I try to help her sometimes.

Q	What's something you might try to help her do?

A	Oh, maybe wash dishes or maybe, you know, try to run the vacuum cleaner but that doesn't work.

Q	Okay.  What about the outside chores?

A	I don't do them, there's a kid next door who does them for me.

Q	Okay.   Now there's an indication in the file that one time you had caused yourself some back pain because you were (INAUDIBLE).

A	As I remember when it was, the kid next door couldn't get the lawn mower started or something and I was trying to help, you know.

Q	Do you have a lawn mower that he uses?

A	Yes.

Q	Okay.  Did he say he was trying to start it?

A	Right.

Q	Did you pull on the mower (INAUDIBLE)?

A	I think I did, yes.

Q	Do you mow the grass?

A       No.

Q       Do you all hire this kid to mow your grass?

A       Well, I can't afford to pay him, you know, but he kind of helps us out, he's a pretty good kid.

Q       Are there any other chores or do you garden or anything like that?

A       I use to try to but I don't know more.

Q       Okay.  Now, you mentioned earlier that you drive, where do you drive to?

A       To the store or something like that.

Q       Do you go shopping?

A       I take her, yes.

Q       Do you go shopping with your wife?

A       I try to, yes.

Q       Okay.  Do you have any problem being on your feet during the time that you were shopping?

A       Yes.

Q       Do you ever have to leave the store and go back to the car?

A       Yes, many times.  Something in them floors or something, if it's marble floor or something it just gets me.

Q       If it's hard floors?

A       Yes.

Q       All right.  Now, do you get out of the house much?  When I say get out of the house I mean away from the house to go somewhere?

A       No.  I don't like being around too many people.

Q       Has that been something that's happened over the last few years?

A       Yes, it seems to.

Q       Were you having that trouble when say you were working as a police officer?

A       Well, I don't know, it could of been some of it, yes.

Q       Do you think it's gotten worse now?

A       Well I know it has.

Q       Do you visit with anyone, friends or family?

A       No.

Q       Does anyone come to visit you?

A       Not too often, no.

Q       Do you all get to go out to dinner or movies or anything like that?

Q       No.


[EXAMINATION OF CLAIMANT BY ALJ] (Tr. 668)

Q       So your back condition began in the early '80's with that injury?

A       I think so.  I know it was some time in the 80's.

Q       Do you manage your own finances?

A       Yes, I try to.

Q       When is the last time you hunted?

A       Well, maybe three, four years.

Q       Fishing?

A       Same, you know, I don't fish too much.

Q       Do you have a license?

A       You mean a hunting and fishing license?

Q       Right.

A       No, I don't.

Q       Where's the pain, it's primarily in your left side?

A       Right here around my left hip.

Q       What does it feel like?

A       It's a burning sensation, it's just like needles going through it and like you're
walking on needles or something from where it's being numb.

*               *               *

Hearing #3: March 29, 2005

[EXAMINATION OF CLAIMANT BY ALJ] (Tr. 685)

Q       How much do you drive now (INAUDIBLE)?

A       Miles per day or week?

Q       A week.

A       Thirty, forty miles.

Q       And where might you go?

A       To the store, you know.

*               *               *

[EXAMINATION OF CLAIMANT BY ATTORNEY] (Tr. 689)

Q       Okay.  Now, Mr. Brady, you've heard me mention several times in my opening

statements the term sedentary work. I want to ask you a question, could you be on your feet for six hours out of an eight hour day on a full-time schedule?

A       No.

Q       Could you be on your feet for four hours out of an eight hour day on a full-time schedule?

A       No.

Q       Could you lift between 10 and 20 pounds throughout the day or on a full-time schedule?

A       No.

Q       Mr. Brady, during this time period when we're generally concerned with before June of 2003, were you having pain?

A       I've always got pain, I've constantly got pain.

Q       All right. Did you notice any difficulties, I think you mentioned in the beginning with your leg.

A       Well my left leg I drag it now, I drag my left foot.

Q       How long has that gone on?

A       The last five, six years at least.

Q       Okay. What were you doing to relieve pain?

A       Well, like I said, I was taking pain medication at one time.

Q       Okay. Did you ever do anything else like hot showers, heat, ice, lay down, anything like that?

A       I laid a lot with the heating pad and, you know, did hot showers.

Q     Okay.  Let me ask you a couple more questions about laying down.   How often would you do that?

A     Daily, every day.

Q     And I know you probably don't ever measure it, but let's say in an eight hour time period back before June of '03, how much time do you think you were spending laying down?

A     Three, four hours.

*          *          *

Q     What's your pain feel like in your back?

A     It's just like a toothache, it just throbs, aches.  Like numb, you know, to get numb.

Q     When you were receiving the Workmen's Comp (INAUDIBLE)?

A     I think on the one job I did yes, for a couple weeks.

Q     Now, you said you lie down four hours.  Would that be like in what time frame?

A     Well, it varies back and forth.

Q     What do you normally do during the day?

A     Mostly just sit, lay around.

Q     Do you have any friends?

A     Yeah.

Q     Do you all do anything together?

A     Not much.

Q     Do you hunt?

A     I use to.  I have a problem now tripping and falling in the woods.

Q     How did you hunt, by (INAUDIBLE) at all?

A       No.

Q       Did you fish last summer at all?

A       No.

Q       Have you made any trips to Cleveland?

A       Not in the last few years, no.

Q       When's the last time you went there?

A       Maybe a year and a half ago.

Q       And what did you go for?

A       Just a visit.

Q       Friends or family?

A       Family.

Q       And how long did you stay?

A       I think two or three days.

Q       Did you drive?

A       Some parts of the way.

Q       And then who was with you?

A       I had another friend go with me to help.

Q       Did you go to any sporting events or anything like that?  Do you attend church?

A       No.

Q       Did you use to?

A       When I was younger, yes.

Q       Do you have children, Mr. Brady?

| A | Yes, I do. |
| Q | And where do they live? |
| A | Charleston. |
| Q | Do you visit with them? |
| A | It's been awhile, quite awhile. |
| Q | Do they come here? |
| A | Sometimes, yes. |

*   *   *

[RE-EXAMINATION OF CLAIMANT BY ALJ] (Tr. 699)

| ALJ | Did you use a cane in '03? |
| CLMT | I have, yes. |
| ALJ | Do you have it with you today? |
| CLMT | No, I don't. |
| ALJ | How often would you use a cane normally (INAUDIBLE)? |
| CLMT | Well, you know, it depends on the pain, you know, when I'm walking |

through the house or something, you know.

*   *   *

E. <u>Lifestyle Evidence</u>

The following evidence concerning the Claimant's lifestyle was obtained at the three hearings and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

• Needs help dressing. (Tr. 209)

- Able to drive.  (Tr. 211)

- Reads newspapers for 20 minutes.  (Tr. 211)

- Watches television for 2.5 to 3 hours per day.  (Tr. 211, 299)

- Enjoys walking, when able.  (Tr. 211)

- Leaves house twice per week with wife.  (Tr. 212)

- Has difficulty concentrating.  (Tr. 212)

- Difficulty following written or spoken instructions.  (Tr. 212)

- Shops for food for 30 minutes to an hour.  (Tr. 250, 299)

- Able to pay bills and run errands, with wife's assistance.  (Tr. 298)

- Sometimes takes out the garbage.  (Tr. 344)

- Walks 500-600 feet to the mailbox.  (Tr. 659)

- Took a trip to Cleveland in late 2003 or early 2004.  (Tr. 697)

- Alcohol and cannabis dependence.  (Tr. 589).


### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant argues 1) the ALJ did not comply with the Appeals Council's remand order dated November 16, 2004; 2) substantial evidence does not support the ALJ's light RFC finding; and 3) the ALJ violated Fourth Circuit precedent when summarily concluding Claimant's spinal impairment did not meet or equal Listing 1.04.  Commissioner argues the ALJ complied with the Appeals Council's Order; substantial evidence supports the ALJ's light RFC finding; and the record does not support a finding Claimant's spinal impairment meets or equals Listing 1.04.

B.      The Standards.

        1.      Summary Judgment.  Summary judgment is appropriate if "the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,

show there is no genuine issue as to material fact and the moving party is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial

burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party

opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587

(1986).  However, "a party opposing a properly supported motion for summary judgment may

not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts

showing that there is a genuine issue for trial." Anderson v.  Liberty Lobby, Inc., 477 U.S. 242,

256 (1986).

        2.      Judicial Review.  Only a final determination of the Commissioner may receive

judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir.

1986).

        3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears

the burden of showing that she has a medically determinable impairment that is so severe that it

prevents her from engaging in any substantial gainful activity that exists in the national

economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

        4.      Social Security - Medically Determinable Impairment.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S.

Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      Social Security - Substantial Evidence - Defined.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.     Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy.  Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.     Discussion

1.     Whether the ALJ Complied with the Appeals Council's Remand Order Dated November 16, 2004.

Claimant argues the ALJ's May 6, 2005 decision failed to comply with the Appeals Council's November 16, 2004 remand order because the ALJ 1) failed to reconsider Claimant's RFC, and, instead, merely adopted the same reasoning and same RFC from his previous decision, and 2) failed to provide any rationale for his finding Claimant was disabled on June 5, 2003 but not before.  Commissioner argues the ALJ complied with the Appeals Council's order.

Decisions of the Appeals Council are binding upon the ALJ.  20 C.F.R. § 404.977.  When the Appeals Council remands a case, the ALJ must take the action the Appeals Council orders.  Id.  An ALJ's failure to comply with an Appeals Council's order may result in remand.  Geracitano v. Callahan, 979 F. Supp. 952, 957 (W.D.N.Y. 1997); Lancaster v. Sullivan, 1992 U.S. Dist. LEXIS 7057, at *12 (N.D. Ill. May 22, 1992).  The Appeals Council in the present

case vacated the ALJ's June 4, 2003 decision wherein the ALJ found Claimant retained the RFC to perform a limited range of light work. (Tr. 93). It remanded the case to the ALJ "for resolution of the following issue with respect to the period prior to June 5, 2003":

> "The Administrative Law Judge held that the claimant could perform a range of light work and that he was not disabled under the Framework of Rules 202.18 and 202.11 of the Medical-Vocational Guidelines. In the subsequent favorable determination, the State agency found that the claimant was limited to a range of sedentary work and was disabled under Rule 201.10. . . . The State agency apparently relied on a report of a consultative examination that was performed in September 2003. . . . A further evaluation of the claimant's residual functional capacity is warranted."

(Tr. 103). It light of its above concern, the Appeals Council directed the ALJ to, upon remand:

> "Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 C.F.R. 404.1545 and 416.945) and Social Security Rulings 85-16 and 96-8p."

(Tr. 104). Upon remand, the ALJ found Claimant, from December 2, 1998 through June 4, 2003, retained the RFC to perform a limited range of light work. (Tr. 36). The Court finds the ALJ satisfied the remand's explicit directive, and underlying purpose.

The Appeals Council ordered the ALJ to "give further consideration" to Claimant's RFC and "provide appropriate rationale with specific references to evidence of record in support of the assessed limitations." (Tr. 104). The ALJ, in his post-remand decision, extensively considered the newly admitted medical evidence submitted in connection with the Appeals Council's remand (Exhibits 36F through 48F). (See Tr. 27, 28, 32, 33, 36, 37). He also considered Claimant's testimony from the March 29, 2005 hearing. (Tr. 28). The ALJ therefore gave "further consideration" to Claimant's RFC, and did not, as Claimant alleges, merely recycle his decision from June 4, 2003. The fact the ALJ relied on similar evidence and analyses in both decisions does not render his post-remand decision non-compliant with the Appeals Council's

41

order.

The ALJ also addressed the Appeals Council's primary concern related to Claimant's RFC, namely the potential impact on the ALJ's RFC determination of Dr. Beard's report and the State agency's disability finding. Contrary to Claimant's assertion, there is nothing in the language of the remand order to suggest the ALJ was required to undertake an entirely, or even partially, new RFC analysis. Similarly, there is no evidence the ALJ was required to justify how Claimant could be found disabled on June 5, 2003, but not on June 4, 2003, one day earlier. Rather, the ALJ was required merely to further consider Claimant's RFC "with respect to the period prior to June 5, 2003." The ALJ did just that.

For the above reasons, the Court recommends relief be denied. In so recommending, the Court relies on the distinction between finding the ALJ complied with the Appeal's Council order, and finding the ALJ's RFC determination is supported by substantial evidence. Additionally, the Court has considered Reichard v. Barnhart, 285 F. Supp. 2d 728 (S.D.W.Va. 2003), and concludes it is inapplicable to the present case. In Reichard, the ALJ found in his "first" decision the claimant was not disabled as of February 23, 2001. Id. at 730. The claimant appealed the ALJ's decision to the Appeals Council. Id. While his claim was pending before the Appeals Council, the claimant filed another application for SSI and DIB. Id. Following a hearing on that subsequent application, the same ALJ issued a "second" decision finding Claimant disabled as of March 1, 2001. Id. The Court found the ALJ's second decision, and the evidence relied on by the ALJ in his second decision, constituted "new and material evidence" that may have changed the outcome of the first decision. Id. at 733-34. Relying on 42 U.S.C. § 405(g), the Court remanded the ALJ's "first" decision to the Commissioner for consideration of

the "new" evidence. Id. at 734. The present case is distinguishable from Reichard because the ALJ in the present case, unlike the ALJ in Reichard, was afforded the opportunity via the Appeals Council's remand to consider the "new" evidence underlying the State agency's disability decision. The purpose underlying the remand in Reichart has therefore been satisfied.

        2.        Whether Substantial Evidence Supports the ALJ's Light RFC Finding.

Claimant alleges the ALJ's finding Claimant could perform light work is not supported by substantial evidence, and is contrary to Dr. Lauderman's, Dr. Lim's, and Dr. Pavlovich's finding Claimant is limited to sedentary work. Commissioner argues the ALJ's determination of Claimant's RFC is supported by substantial evidence; that Dr. Pavlovich's opinion is not entitled to controlling weight; and that Claimant erroneously relies on Dr. Lauderman's report. Commissioner did not explicitly address Claimant's argument regarding Dr. Lim.

At step four of the sequential analysis, the ALJ must determine the claimant's RFC. 20 C.F.R § 404.1520. The RFC is what a claimant can still do despite her limitations. Id. at § 404.1545. More specifically, it is an assessment of a claimant's functional limitations resulting from medically determinable impairments (or combination of impairments) and includes the impact of related symptoms such as pain. SSR 96-8p (1996). The determination of a claimant's RFC is based upon all of the relevant evidence. 20 C.F.R. § 404.1545. Observations by treating physicians, psychologists, family, neighbors, friends, or other persons of Claimant's limitations may be used. Id. These descriptions and observations must be considered along with medical records to assist the Social Security Administration to decide to what extent an impairment keeps a claimant from performing particular work activities. Id. The ALJ must consider limitations imposed by all a claimant's impairments, even those that are not "severe." SSR 96-8p. This

assessment is not a decision on whether a Claimant is disabled, but is used as a basis for determining the particular types of work a claimant may be able to do despite his impairments. Id.

The ALJ in the present case concluded Claimant retained the residual functional capacity during the period December 2, 1998 through June 4, 2003 to perform:

> "the demands of light work with certain modifications; being allowed to sit or stand at will during the workday. He could perform no climbing or repetitive bending. All exposure to hazards, such as moving machinery and unprotected heights must be avoided. The claimant was limited to unskilled, low stress, entry-level work that involves one-to- two-step work processes and routine, repetitive tasks, primarily working with things rather than people."

(Tr. 36). The Court has reviewed the ALJ's conclusion. The Court finds the ALJ's light RFC determination is supported by the following evidence. First, DDS physicians Dr. Franyutti (Tr. 328), Dr. Brown (Tr. 348), Dr. Osborne (Tr. 448), and Dr. Simmons (Tr. 476) concluded Claimant retained the RFC to perform light work. Dr. Beard, an examining physician also concluded Claimant could perform light work (Tr. 517). Second, numerous medical opinions established Claimant retained, for the most part, a normal range of motion, and lacked any defect in gait. (Tr. 320, 442, 512). Finally, Claimant retains the ability to drive 30-40 miles per week (Tr. 36), take a road trip to Cleveland for a few days, drive, shop, and take out the garbage (Tr. 28-29).

Despite the significant amount of evidence supporting the ALJ's decision, the Court cannot find the ALJ's light RFC finding is supported by substantial evidence, because the ALJ did not sufficiently document his consideration of a portion of Dr. Lauderman's October 2003 report, and the entirety of Dr. Lim's October 2003 report. Specifically, the ALJ failed to address the inconsistency between Dr. Lauderman's assignment of an admittedly "light" RFC to

44

Claimant, and the doctor's ultimate conclusion in the same report Claimant was limited to sedentary work. (Tr. 563). Instead, the ALJ merely asserted Dr. Lauderman found Claimant could do a range of light work. (Tr. 37). The ALJ also failed to address Dr. Lim's affirmation of Dr. Lauderman's sedentary RFC finding. (Tr. 600). In light of the above omissions by the ALJ, the Court cannot be certain the ALJ fulfilled his duty to "explore all relevant facts and inquire into the issues necessary for adequate development of the record." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court therefore recommends the case be remanded for further consideration of Claimant's RFC in light of Dr. Lauderman's comments in his October 2003 report, and Dr. Lim's opinion in his October 2003 report. The ALJ should also give further consideration to Dr. Pavlovich's reports. While the ALJ's reasons for discrediting Dr. Pavlovich's reports appear supported by substantial evidence, his reasons included the fact the reports were not supported by the record. If the ALJ, upon remand, interprets Dr. Lauderman's October 2003 as recommending a sedentary RFC, Dr. Pavlovich's report gains increased support in the record.

      3.      Whether the ALJ Failed to Comply with *Cook v. Heckler* When Discussing Listing 1.04.

Claimant alleges the ALJ failed to comply with the Fourth Circuit mandate set forth in Cook v. Heckler, 783 F.2d 1168, 1172-73 (4th Cir. 1986), that he explain his rationale for concluding Claimant's spinal impairment did not meet or equal Listing 1.04. Commissioner argues the Claimant's allegation does not warrant relief because the evidence in the record does not support a finding Claimant's spinal impairment meets or equals Listing 1.04.

Listing 1.04, Disorders of the Spine, sets forth the following criteria:

"Disorders of the spine . . . resulting in compromise of a nerve root (including the cauda

equina) or the spinal cord. With:

A. Evidence of a nerve root compression characterized by neuro-anatomic distribution of pain, limitation or motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by finding an appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § 404, subpt. P, app. 1, Listing 1.04. The ALJ in the present case concluded at step three of the analysis:

"[t]he claimant's medical treatment record does not establish that the claimant has the clinical and laboratory findings, or functional limitations on physical or mental examination, as required for his degenerative disc disease of the lumbar spine, major depressive disorder, pain disorder, and borderline intellectual functioning, either alone or in combination, to meet the severity of section 1.04, 12.02, 12.04, and 12.07 of the Listing of Impairments."

(Tr. 34). The Court agrees with Claimant that the ALJ's conclusion regarding Listing 1.04 fails to comply with Cook.

In Cook, 783 F.2d at 1172-73, the ALJ concluded the claimant's arthritis impairment did not "meet or equal in severity the requirements of Section 1.01 of Appendix 1, Subpart P as there is no joint enlargement, deformity, effusion, or the other mandated criteria." The Court found the ALJ's explanation was deficient because the ALJ failed to explain the reasons behind his conclusion the claimant's impairment did not meet or equal a Listing. Id. at 1172. It held the ALJ should have, but failed to, compare the claimant's symptoms with the criteria of the relevant Listing. Id. at 1173. The Court concluded that without such an explanation by the ALJ, it was "simply impossible to tell whether there is substantial evidence to support the determination."

Id.

Like the ALJ in <u>Cook</u>, the ALJ in the present case failed to sufficiently explain his rationale for finding Claimant's spinal impairment did not meet Listing 1.04.  Furthermore, and in direct violation of <u>Cook</u>, the ALJ failed to compare Claimant's symptoms with the criteria in Listing 1.04.  <u>See Cook</u>, 783 F.2d at 1173.  While the ALJ did undertake an in-depth analysis of the evidence relating to Claimant's spinal impairment, he did not identify what evidence he relied on when concluding Claimant's impairment did not meet or equal Listing 1.04.  Due to the vast quantity of evidence set forth by the ALJ relating to Claimant's spinal impairment, and the fact the evidence does not entirely rule out Claimant's spinal impairment met Listing 1.04, the Court is unable to determine whether the ALJ's conclusion is supported by substantial evidence.

Accordingly, the Court recommends the case be remanded for further explanation of why Claimant's spinal impairment does not meet or equal Listing 1.04.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **GRANTED IN PART**, and **DENIED IN PART**, because while the ALJ complied with the Appeals Council's remand order, the ALJ 1) did not evidence sufficient consideration of Dr. Lauderman's October 2003 report and Dr. Lim's October 2003 report, and 2) failed to sufficiently explain his rationale for finding Claimant's spinal impairment did not meet or equal Listing 1.04.

2.      Commissioner's Motion for Summary Judgment be **GRANTED IN PART**, and **DENIED IN PART** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten

(10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.


DATED: August 15, 2008

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE
